**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| GREGORY WOMACK, | CIVIL ACTION |
| Plaintiff, | NO. 24-cv-1167-MMB |
| v. | **JURY TRIAL DEMANDED** |
| CITY OF PHILADELPHIA, YVONNE RUIZ, JOSEPH WALSH, ROBERT SNELL, ANTHONY TOMAINO, MICHAEL GROSS and PAUL WORRELL | |
| Defendants. | |

**AMENDED COMPLAINT**

## I.    PRELIMINARY STATEMENT

1.    Plaintiff Gregory Womack spent twenty-seven years in prison after the Commonwealth of Pennsylvania violated his Constitutional rights at trial. In March 1996, Plaintiff Womack was tried jointly with three other co-defendants for participation in a December 1993 robbery of a grocery store in which 16- year-old codefendant Julius Jenkins shot and killed the store owner Francisco Azcona. Detectives coerced Plaintiff to confess through deception and threats. At that trial, the Commonwealth introduced the redacted statements of codefendant Atil Finney in violation of *Bruton v. United States*, 391 U.S. 123 (1968) and *Gray v. Maryland*, 523 U.S. 185, 196 (1998) and engaged in deliberate deception by concealing and/or suppressing material evidence. Due to these constitutional violations, Plaintiff was sentenced to life without the possibility of parole.

2.    Twenty-seven years later, upon consideration of Plaintiff's Post-Conviction Relief Action petitions, his conviction was finally vacated.

3.    Philadelphia Police and Assistant District Attorneys undermined the fairness of

1

the Plaintiff's trial and the validity of the jury's verdict. Plaintiff brings this action under 42 U.S.C. §1983 seeking redress for the extraordinary misconduct of Defendants Yvonne Ruiz, Joseph Walsh, Robert Snell, Anthony Tomaino, Michael Gross, and Paul Worrell. The defendants engaged in deliberate deception by concealing and/or suppressing material evidence, coerced statements and confessions, employed unlawful investigative techniques, presented false testimony, and, together with other Philadelphia police officers and Assistant District Attorneys, denied the Plaintiff due process of law and a fair trial. The actions and conduct of the defendants were the results of policies, practices, customs, and deliberate indifference on the part of Defendant City of Philadelphia, including the failure to properly train and supervise officers and Assistant District Attorneys and Police officers, and the failure to take disciplinary and remedial action against the defendants and others who commit serious misconduct and abuses of authority.

## II.    <u>JURISDICTION</u>

4.    This action is brought pursuant to 42 U.S.C. §1983. Jurisdiction is founded upon 28 U.S.C. §§1331 and 1343(1), (3), (4) and the aforementioned statutory provision. Plaintiff further invokes the supplemental jurisdiction of this Court under 28 U.S.C. §1367(a) to adjudicate state law claims.

5.    Venue is proper in the Eastern District of Pennsylvania under 28 U.S.C. § 1391(b) in that this is the District in which the claims arose.

## III.    <u>PARTIES</u>

6.    Plaintiff is a resident of Philadelphia, Pennsylvania and at all times relevant to this action was in the Eastern District of Pennsylvania.

7.    Defendant **City of Philadelphia** is a City of the First Class in the

Commonwealth of Pennsylvania and at all times relevant hereto operated under the color of state law in creating and maintaining a Police Department and District Attorney's Office, was the employer of all individual Defendants, and was officially responsible for all policies, procedures, and practices of the Philadelphia Police Department (PPD) and the District Attorney's Office (DAO).

8.    Defendant **YVONNE RUIZ, ESQUIRE**, (hereinafter sometimes referred to as "ADA Ruiz") at all times relevant to this Complaint was an Assistant District Attorney ("ADA") of the Philadelphia District Attorney's Office ("DAO"), acting under color of state law. These claims are brought against Defendant Ruiz for the performance of investigatory and/or administrative actions, outside the scope of her duties as a prosecutor. Defendant Ruiz is sued in his individual capacity. Upon information and belief, Defendant Ruiz was assigned as a prosecutor to the Homicide Division of the DAO at the time of the investigation into the murder of Francisco Azcona and the wrongful conviction of Gregory Womack.

9.    Gregory Womack's claims against Defendant Ruiz are based on the prosecutor's performance of solely investigatory actions and/or administrative actions, thus stripping her of any claims of immunity that otherwise may be available to her as a prosecutor.

10.    Defendants **Joseph Walsh, Robert Snell, Anthony Tomaino, Michael Gross, and Paul Worrell**, ("the defendant officers") were at all times relevant to this action police officers or detectives for the Philadelphia Police Department acting under color of state law. The defendant officers are being sued in their individual capacities.

11.    At all relevant times, all defendants were acting in concert and conspiracy and their actions deprived the plaintiff of his constitutional and statutory rights.

12.    At all times relevant to this Complaint, all defendants acted under color of state law.

IV.    <u>**FACTUAL ALLEGATIONS**</u>

<u>**The Crime**</u>

13.    On December 11, 1993, a group of boys and men robbed a small neighborhood grocery store in North Philadelphia.

14.    16-year-old Julius Jenkins shot Francisco Azcona, the store's owner, who died shortly thereafter.

15.    The group took the store's cash register and escaped in a station wagon parked nearby.

<u>**The Investigation**</u>

16.    Over a year later, in February and March of 1995, the police questioned Plaintiff several individuals about the grocery store incident.

17.    At the time, Plaintiff was serving a sentence at Camp Hill. He was brought down from the state prison and interrogated by Defendant Walsh and others. During the course of that interrogation, Plaintiff was isolated, threatened and lied to in the hope that he would give a false confession. Walsh even told Plaintiff, "We know you didn't do anything," and assured Plaintiff that by confessing he would get a lighter sentence of no more than seven years.

18.    At the time of deciding whether to "cooperate" with Defendant officers during his interrogation, Plaintiff was assured that there was already overwhelming evidence against him and that he would get a life sentence if he did not sign the confession.

19.    The statement itself was authored wholly and completely by Defendants and was not constructed with any input from Plaintiff Womack. After Plaintiff signed the coerced confession, he was sent back to Camp Hill.

20.    As part of the investigation, Defendant Walsh and others also got confessions

from co-defendants Jenkins and Atil Finney. Neither Gainey nor Trice ever confessed or gave a statement about the crime.

21.    Police also obtained a statement from Demond Jackson, who claimed that he was with the robbers before and afterward but did not participate.

22.    All four statements identified Jenkins as the shooter and claimed that Plaintiff Womack participated in the robbery. But their accounts differed significantly.

23.    According to Jackson's initial statement to police, he and Trice stayed in the car with Plaintiff Womack while three others (Jenkins, Finney, and Gainey) went to the grocery store returning later with Gainey carrying the cash register.

24.    According to Finney's statement, taken by Defendant Michael Gross, Womack and another man named Jerome Cook stayed in the car while he, Jenkins, and Trice went into the grocery store, returning later with Trice carrying the register.

25.    Later in Finney's statement, he added that another man named Shawn Felder was also present in the car (for a total of six people involved).

26.    Finney denied knowing Jackson or that Jackson was with him and the other men.

27.    According to Womack's statement, taken by Defendant Joseph Walsh,  he and Gainey stayed in the car while Jenkins, Finney, and Trice went to the grocery store.

28.    Two eyewitnesses, relatives of the victim, made pre-trial identifications of Jenkins as the shooter, but they were unable to identify any of the other men involved in the robbery.

29.    The Commonwealth charged Jenkins with first-degree murder and Trice, Gainey, Finney, and Womack, with second-degree murder.

30.    Jackson was not charged with any crime related to the grocery store robbery.

### The Trial and Sentencing

31.    The Commonwealth moved to try these five men jointly.

32.    When it became clear that the co-defendants who had given statements

implicating Trice and Gainey in the crimes were not going to testify, Trice's trial counsel moved to sever his trial from his co-defendants, arguing that *Bruton v. United States*, 391 U.S. 123 (1968), prohibits the introduction of a non-testifying co-defendant's confession in a joint trial.

33.    Instead of severing the trials, the Court asked the Commonwealth to redact the co-defendants' statements to remove the prejudicial references to Plaintiff Trice.

34.    The Commonwealth redacted the statements, however the redactions were not uniformly made.

35.    At trial, Detective Michael Gross read to the jury the redacted confession he took from Finney. Finney's statement began:

> "We were riding around in this, this guy's car, me and **three other guys** were in North Philadelphia. We– when one said let's get paid. Everyone said okay and we saw this store. So me and two guys went in the store. When we got inside two guys stayed up front and I stayed to the back. One guy had his gun on the guy and was at the cash register getting the money. But it wouldn't. I heard a short and I looked over. Blood was coming out of the guy's mouth. After that someone grabbed the register, and we all ran out."

36.    Gross then testified that Finney stated:

> "We ran to the car and went back up Germantown. We went to **someone's** house. It's an apartment. And **two guys** got screwdrivers and opened up the register."

37.    Gross then testified that he asked Finney if he knew any of the participants by name and read Finney's redacted answer,

> "**One is and the other is.** I only know two of them by their nicknames."

38.    Gross then testified that he showed Finney some photographs and read Finney's redacted identification:

> "**Number three is. Number six is. Number eight is.**"

39.    Gross then testified that he asked Finney, "Do you know **blank**?", and Finney answered:

"I know a **blank**," and identified "blank" in a photograph.

40.    Gross next read the following questions and answers, which ensured that the jury understood that any neutral pronouns used earlier in the statement were the functional equivalent of the deletions and "blanks":

> Q: Who actually shot the owner of the store?
>
> A: **Someone**.
>
> Q: How do you know that?
>
> A: He was security, he had the gun and he was pointing it at the man.
>
> Q: Who decided who would go in the store?
>
> A: **Someone else** was the leader. He decided who went in.

Detective Gross also read Finney's statement that there were six men in the car.

41.    However, because of redactions, the jury did not learn that two of the men Finney named were Jerome Cook and Shawn Felden.

42.    The following day at trial, Detective Joseph Walsh read the redacted confession he took from Womack, which contained the following excerpts:

> Q: Do you know who shot and killed Francisco Azcona?
>
> A: Yes.
>
> Q: What is his last name and where does he live?
>
> A: His name is **blank**. . . .
>
> Q: Where were you when he shot and killed Francisco Azcona?
>
> A: In my car, the station wagon.
>
> Q: I want you to go on in your own words and tell me what you know about the murder . . . .
>
> A: It was me and **another guy**. We were in the car, the other three went in the store. The car was around the corner and then they came out of the store carrying a cash register........ The we drove

to **someone's** and we opened the register and got the money . . .

Q: Do you know **someone's** real name and where he lives?

A: I don't know his real name. He lives somewhere in **blank**.

Q: Do you know **someone else's** real name and where he lives?

A: We call him **blank**. . . .

Q: What is **someone else's** real name and where does he live?

A: I don't know his real name . . . but when we were locked up he used **blank**.

43.    Detective Walsh read to the jury Plaintiff's responses indicating that he and one other person remained in the car while three others went into the store, and that there may have been a sixth person in the car whom Plaintiff had left out at the beginning of his statement – Demond Jackson – whom Plaintiff stated "might have been" in the car.

44.    Finney's statement was read to the jury with the names of non-defendants redacted.

45.    However, during Walsh's testimony about Plaintiff's statement, the trial court changed course, and the names of non-defendants were read to the jury.

46.    Walsh then told the jury that he showed Plaintiff a picture of "Jerome Cook" and asked him if Cook was in the car, to which Plaintiff allegedly answered, "No, he wasn't there."

47.    The non-identification of Cook further solidified the jury's impression that redacted names were those of the co-defendants. Since both Plaintiff and Finney allegedly said six people were in the car, this gave the impression that both said they were the five defendants plus Jackson.

48.    Jackson testified, contrary to his statement, that four men –Trice, Gainey, Finney, and Jenkins – entered the grocery store, he and Plaintiff remained in Plaintiff's station wagon,

and when the others returned, Trice was carrying the register.

49.     Per Jackson, two men, Finney and Jenkins, had guns when they went into the grocery store.

50.     Jackson was a highly problematic witness for the Commonwealth. In addition to his incentive to cooperate to avoid being charged in this case – though the trial court instructed the jury that they could view him as an accomplice and, accordingly, disfavor his testimony – he had three open drug cases, the disposition of which had been postponed several times pending trial; his testimony was riddled with inconsistencies; he admitted crafting an elaborate lie to police (provided in a signed statement) to hide his involvement in another robbery on the night of the grocery store incident; he admitted lying under oath at the preliminary hearing about whether he had used drugs on the night of the grocery store incident; and he testified that, at one point, he went over his police statement related to this case with detectives and "they corrected all my mistakes."

51.     In closing argument, the prosecutor, Defendant Ruiz, used the co-defendant statements, arguing that they corroborated Jackson's testimony.

52.     Defendant Ruiz also argued that they provided evidence of the conspiracy charges which all defendants faced.

53.      These uses of the co-defendant statements are prohibited by *Bruton*, and its progeny.

54.     The jury deliberated over three days, March 11-13, 1996. On the second day, the jury announced that it had reached a verdict on three of the five defendants but was unable to agree on the others, and the court instructed the jury to continue deliberating.

55.     Plaintiff was found guilty of third-degree murder, and the court sentenced them to life imprisonment without the possibility of parole, a term which he served since 1996.

**Post-Trial Proceedings**

56.     Plaintiff a direct appeal of his conviction, which was denied.

57.     Plaintiff also filed a petition for federal habeas relief in the United States District Court for the Eastern District of Pennsylvania and several petitioner for post-conviction relief in the Court of Common Pleas.

58.     On February 11, 2022, Plaintiff filed a subsequent Petition for Post-Conviction Relief. The Commonwealth responded on March 10, 2022, and Plaintiff was offered a deal whereby the nightmare of his wrongful incarceration would end, and he would be freed.

59.     Considering the inordinate amount of time that the Plaintiff has already spent in prison and given his knowledge of the District Attorney's ability to delay cases and keep innocent individuals in prison, the Plaintiff made a decision to accept the deal.

60.     On March 18, 2022, Plaintiff's conviction was vacated by the Honorable Barbara McDermott, who then accepted his plea and sentenced him to time served.

61.     The actions and conduct of the individual defendants as described above violated the plaintiff's Fourteenth Amendment right to due process of law and a fair trial.

62.     The defendant officers and Assistant District Attorney were deliberately deceptive by concealing and/or suppressing critical evidence – evidence linking fewer than four people to the scene of the crime, evidence of alternative suspects, and undisclosed reports of crime on the same night and in the same vicinity implicating Commonwealth witnesses – and thus violated the plaintiff's right to due process of law and a fair trial.

63.     Defendants' failure to conduct a reasonably thorough investigation that considered evidence negating the existence of grounds to prosecute Plaintiff, including the testimony and evidence referenced above, denied the Plaintiff a fair trial.

64.     The concealment and/or failure to disclose the relevant and material evidence described above violated the plaintiff's right to due process of law and a fair trial.

65.     As a result of the actions and inactions of the defendant officers and Assistant

District Attorney, Plaintiff was compelled to stand trial in a murder case, causing him

substantial harm.

**The PPD's pattern and practice of unconstitutional misconduct in homicide investigations, including the fabrication of evidence, coercion and threats to secure false statements from witnesses and suspects, failure to conduct proper investigations, and suppression of exculpatory evidence**

66.     For many years dating back at least to the 1970's, and continuing well beyond the

time of the investigation of Mr. Azcona's murder, the City of Philadelphia, had in force and

effect a policy, practice, or custom of unconstitutional misconduct in homicide investigations,

and in particular, using coercive techniques in interviews and interrogations to obtain

incriminating evidence; fabricating inculpatory evidence; conducting improper identification

procedures; concealing or withholding exculpatory evidence; tampering with or manufacturing

evidence; and fabricating incriminating statements from witnesses, suspects, and arrestees.

67.     This policy, practice, or custom involved the use of various techniques to coerce

incriminating statements, including without limitation: isolation; separating juvenile or otherwise

vulnerable suspects or witnesses from friends and family; subjecting individuals to needlessly

prolonged interrogations; making false promises, including the promise that a suspect or witness

will be allowed to go home if he or she makes an inculpatory statement and/or be given favorable

treatment; the use or threat of physical violence; authoritative assertions of a suspect's guilt,

including without limitation confrontation with false inculpatory evidence; and providing false

assurances—including to juveniles and other vulnerable people—that the suspect or witness will

benefit from making an inculpatory statement that minimizes the suspect's own involvement.

68.     These practices were well known to the City of Philadelphia and its policymakers

with respect to criminal investigations and prosecutions as a result of newspaper investigations

including Pulitzer Prize winning reporting in the *Philadelphia Inquirer* in 1977, governmental

investigations, complaints from lawyers and civilians, and internal police investigations.

69.    Various cases demonstrate that this misconduct was pervasive within the Philadelphia Police Department at time of Plaintiff's 1996 trial, and, upon information and belief, the misconduct described below was committed with the knowledge of Homicide Unit and PPD supervisors or because of their deliberate indifference to this misconduct.

a.    **Anthony Wright** (CP-51-CR-1131582-1991).  Mr. Wright had been convicted of the rape and murder of an elderly woman based on misconduct by homicide detectives including the tampering with evidence, coercive witness interrogation, planting evidence and numerous other actions that denied Mr. Wright a fair trial. After spending nearly twenty-five years in prison, Mr. Wright was exonerated by DNA evidence.

b.    **Carlos Hernandez** (CP-51-CR-0302131-1991) & Ed Williams. A woman and her boyfriend were robbed at gunpoint by two men and her boyfriend was shot. Detectives interrogated a key witness, Juan Sanchez, and extracted a statement from him implicating Carlos Hernandez and another man. Mr. Sanchez described the circumstances of his statement as follows: the detective held him in custody and interrogated him for three days, without food or water; he was denied use of the bathroom and had to urinate on the floor; the detective hit him several times. After coercing Mr. Sanchez's statement, the detective interrogated Mr. Hernandez and obtained a statement from him implicating Ed Williams. Mr. Hernandez described the circumstances of his statement as follows: the detective had him handcuffed to a chair and held him without water, food, or use of a bathroom; the detective punched him in the face and pressed his foot on Mr. Hernandez's crotch until he relented and signed the statement. Later it was proved that Mr. Williams

was in a secured drug treatment facility at the time of the crime.

c. **Jackie Combs Jr.** PPD detectives, coerced four young witnesses into testifying against Mr. Combs for a murder that he denies committing. One of those witnesses, just 15 at the time, has told reporters that she felt "it's my fault, because I changed my story, saying this man killed this guy [and] knowing he didn't do it." The witnesses, who gave varied accounts of the killing, have explained that their statements were the result of physical and verbal abuse by detectives.

d. **Willie Veasy** (CP-51-CR-0641521-1992). Mr. Veasy was convicted of a murder that occurred in South Philadelphia while he was working at a popular and busy restaurant. Mr. Veasy was interrogated by detectives until he provided a "confession." Mr. Veasy has described that the detective isolated him in an interrogation room where the detective smacked him around and kicked his testicles several times until Mr. Veasy agreed to sign the "confession."

e. **Percy St. George** (CP-51-CR-1012571-1993). In investigating a murder, the detective obtained a statement from a witness who, because there were warrants out for his arrest, signed the statement under a friend's name: David Glenn. As trial approached, PPD officers picked up the actual David Glenn. At the station, the detective coerced the real David Glenn into signing a new false statement saying he saw the crime and identifying Mr. St. George from a sham photo array prepared by the detective. After David Glenn testified regarding the detective's misconduct and disavowed the statement the detective had coerced him to sign, the detective notified the Court and the Commonwealth of his intention to assert

his 5th Amendment right against self-incrimination to avoid having to testify about his actions in that case. Shortly after receiving this letter from the detective's counsel, the prosecution dismissed all charges against St. George, but the detective remained with the PPD through September 1996.

f.    **Donald Ray Adams** (CP 51-CR-0743812-1991). Mr. Adams was charged and convicted in the 1990 murders of Darryl Patterson and Thomas Winn. The initial investigation of the case did not produce a suspect and in June, 1991 PPD Detectives David Clark and Igor Alfimow were assigned to re-investigate the matter. These detectives secured a statement from an alleged witness, Donna Benjamin, implicating Mr. Adams. Based almost entirely on this testimony, Mr. Adams was convicted and sentenced to life imprisonment. In fact, the statement from Ms. Benjamin was coerced and false and some years later she recanted. In 2007, the Court of Common Pleas granted post- conviction relief based on the testimony of Ms. Benjamin that the detectives threatened her with incarceration, promised that her open criminal charges would be dismissed, and offered her financial and other material support for her testimony. The detectives ignored the fact that other witnesses provided physical descriptions of the assailant as over six feet tall, thin, light skinned and in his 20's. Mr. Adams was 5'4", 200 pounds, dark skinned and in his 30's. Moreover, there was evidence pointing towards another "Don Ray" (Don Ray Bennett) who lived in the neighborhood, fit the description of the assailant, and whose family had been in disputes with the victims. Indeed, Ms. Benjamin stated that it was Don Ray Bennett in her recantation. At a retrial, Mr. Adams was acquitted of all charges. In a subsequent

civil suit for malicious prosecution, the matter was settled and Mr. Adams
received compensation for his wrongful conviction.

g.    **Andrew Swainson** (CP-51-CR-0431331-1988). In 1989, Andrew Swainson was
convicted of murder on the statement of a single eyewitness, Paul Presley—an
original suspect arrested for the shooting moments after it occurred, covered in
blood and running from the scene at 3:40 a.m. The prosecution dropped charges
against Presley three weeks later. Detective Santiago soon took a statement from
Presley. Presley explained Det. Santiago's tactics: Presley had not seen Swainson
at the time of the shooting, and only knew what he looked like because he'd been
shown his picture by Det. Santiago. Rather than showing Presley a real photo
array, all seven photos that Det. Santiago showed Presley were of Swainson.
Presley explained that he only testified against Swainson because he was coerced
with threats of being charged for a separate drug crime. (Presley was charged
under a different name, and the Commonwealth never disclosed the matter
*Commonwealth v. Kareem Miller*, DC No. 881855934; CP-51-CR-1024751, to
Mr. Swainson.) Mr. Swainson has a PCRA petition pending and is represented by
counsel from Morgan Lewis.

h.    **Walter Ogrod** (CP-51-CR-0532781-1992). Mr. Ogrod, a trucker with a low-
average IQ, was sentenced to death for the murder of a four-year-old girl based
entirely on a "confession" Ogrod gave to Detective Devlin. Ogrod had driven all
night and had not been to bed in 36 hours when Det. Devlin went to work.
According to Det. Devlin, about an hour into the interrogation, Ogrod supposedly
burst into tears and gave a 16-page confession. Ogrod, however, has claimed that

he was interrogated for hours by Det. Devlin and a second detective. He finally broke from lack of sleep and began to believe what they detectives fed him— eventually signing the statement written out in longhand by Det. Devlin. After hearing Ogrod's testimony, 11 of 12 jurors voted to acquit before a mistrial was declared. At a retrial three years later, with the aid of a notorious jailhouse snitch, the state convicted Ogrod of capital murder. Mr. Ogrod has a PCRA petition pending and is represented by counsel from Morgan Lewis and the Federal Defender.

70.    At the time of the investigation and prosecution of Plaintiff in 1993-1996, the PPD had a policy, practice, or custom of detaining, arresting, and interrogating purported witnesses without legal cause and with the intent of coercing statements from these persons, under threat of punishment or other sanctions, and/or for material benefits. These detentions and interrogations were conducted without voluntary consent and without the benefit of advice of counsel, even where the purported witness and/or her attorney sought the right to consult.

71.    This practice, as exemplified by the investigations in Plaintiff's case and those detailed above, continued for years due to the deliberate indifference of the PPD and City of Philadelphia to this policy, practice, and custom.  Finally, in 2014, after further proof of this policy, practice, and custom was provided to the PPD, the District Attorney, and the City, the PPD issued Directive 151 (January 1, 2014), that provided legal standards for the detention and interview of witnesses and the detention and interrogation of suspects by police detectives.

72.    During the 1980's and early 1990's, and concurrent with the time of the investigation of this case by the PPD, there was within the Department a pattern, practice, and custom of violating the constitutional rights of criminal suspects and others, including systemic

violations of the Fourth and Fourteenth Amendments.  On three separate occasions in the 1980's

courts in the Eastern District of Pennsylvania issued orders enjoining the PPD from engaging in

these practices. *See Cliett v. City of Philadelphia*, C.A. No. 85-1846 (E.D. Pa. 1985) (consent

decree arising out of "Operation Cold Turkey," that resulted in the unlawful arrest and detention

of 1500 individuals in drug enforcement practices); *Spring Garden Neighbors v. City of*

*Philadelphia*, 614 F.Supp. 1350 (E.D. Pa. 1985) (enjoining police sweeps of Latinos in Spring

Garden area in a homicide investigation); *Arrington v. City of Philadelphia*, C.A. No. 88-2264

(E.D. Pa. 1988) (enjoining stops, detentions and searches of African-American men during

investigation of the "Center City Stalker").

      73.     Thereafter in the late 1980's and early 1990's a narcotics squad operating out of

the 39th Police District in Philadelphia engaged in widespread unconstitutional practices,

including fabrication of evidence, unlawful search and arrest warrants, concealment of evidence,

false allegations of criminality, fabricating and planting evidence, coercive and physically

abusive interrogations, and theft. This squad engaged in these practices for years and violated the

rights of thousands of persons, due to the deliberate indifference of the PPD, including the

disregard of credible complaints to IAD and District Attorney, biased internal investigations, and

a practice and custom of exonerating officers regardless of evidence of misconduct.

      74.     This systemic and unconstitutional practice and custom was ended only upon

investigation by the FBI and prosecution of the officers by the United States Attorney's Office.

As a result of this pattern of police misconduct that was in effect at the time of the investigation

of the homicide for which Plaintiff was charged, a Court in the Eastern District entered a

Consent Decree requiring wide ranging reforms in the Philadelphia Police Department, and in

particular providing for specific limitations on the investigative practices and policies of the

PPD. *See NAACP v. City of Philadelphia*, C.A. No. 96-6045.

75.    In summary, at the time of the investigation and prosecution of Plaintiff's, the PPD had a practice, policy, and custom of:

    a.    Engaging in unlawful interrogation of suspects, using coercion and threats during interrogations, unlawful witness detentions and interrogations, fabricating and planting evidence, fabricating witness and suspect statements, using improper identification procedures, and concealing and/or failing to disclose exculpatory evidence;

    b.    Failing to take appropriate disciplinary or other corrective actions with respect to police officers who engaged in illegal or unconstitutional conduct and/or violate generally accepted police practices;

    c.    Failing to properly train and supervise officers with respect to the constitutional limitations on their investigative, detention, search and arrest powers;

    d.    Ignoring, with deliberate indifference, systemic patterns of police misconduct and abuse of civilians' rights in the course of police investigations and prosecutions of criminal suspects and defendants, including unlawful police interrogations, searches, and arrests, coercion of witnesses, improper identification procedures, falsifying and fabricating evidence, and suppressing exculpatory evidence; and

    e.    Failing to properly sanction or discipline PPD officers, who are aware of and conceal and/or aid and abet violations of constitutional rights of individuals by other PPD officers, thereby causing and encouraging Philadelphia police, including the defendant officers in this case, to violate the rights of citizens such as Plaintiff.

76.     At the time of the investigation and prosecution of Plaintiff, and for many years before and thereafter, the PPD and the City of Philadelphia has been deliberately indifferent to the need to train, supervise, and discipline police officers. The Internal Affairs Division (IAD) of the PPD has failed to provide an internal disciplinary mechanism that imposes meaningful disciplinary and remedial actions in the following respects:

a.     excessive and chronic delays in resolving disciplinary complaints;

b.     a lack of consistent, rational and meaningful disciplinary and remedial actions;

c.     a failure to effectively discipline substantial numbers of officers who were found to have engaged in misconduct;

d.     the PPD's internal investigatory process fell below accepted practices and was arbitrary and inconsistent;

e.     the PPD discipline, as practiced, was incident-based rather than progressive; thus, repeat violators were not penalized in proportion to the number of violations;

f.     the conduct of IAD investigations demonstrated that PPD internal affairs personnel were not adequately trained and supervised in the proper conduct of such investigations;

g.     a global analysis of IAD's investigatory procedures indicated a pattern of administrative conduct where the benefit of the doubt was given to the officer rather than the complainant;

h.     serious deficiencies in the quality of IAD investigations and the validity of the IAD findings and conclusions;

i.     lack of an effective early warning system to  i dentify, track, and monitor "problem" officers;

j.      IAD frequently failed to interview available eyewitnesses to incidents involving citizen complaints of misconduct; interviews that were conducted were below acceptable standards of police practice and failed to address key issues; and

k.      IAD failed to acknowledge the disproportionate and extreme use of force used by police officers in the investigation of citizen complaints and failed to properly categorize the police officers' misconduct in those cases as an impermissible use of force.

## V.      CAUSES OF ACTION

### COUNT I: 42 U.S.C. § 1983 Deprivation of Liberty without Due Process of Law and Denial of a Fair Trial Under the Fourteenth Amendment Against All Individual Defendants

77.     Plaintiff incorporates by reference all the foregoing paragraphs.

78.     The individual defendants, acting individually and in concert, and within the scope of their employment with the City of Philadelphia, deprived Plaintiff of their clearly established constitutional right to due process of law and to a fair trial by:

**Coerced Confession:** The defendant officers brought Plaintiff to the homicide division and then used lies and threats to coerce him into making an incriminating statement; and

**Deliberate Deception:** The defendant officers and assistant district attorneys deliberately deceived counsel and the court by concealing and/or suppressing relevant and material evidence linking fewer than four people to the scene of the crime, evidence of alternative suspects, and undisclosed reports of crime on the same night and in the same vicinity implicating Commonwealth witnesses.

79.     The individual defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference Plaintiff's clearly established constitutional rights.  No reasonable officer or assistant district attorney in

1993-1996 would have believed this conduct was lawful.

80.    Defendants' acts and omissions, as described above, were the direct and proximate cause of Plaintiff's injuries. Defendants knew, or should have known, that their conduct would result in Plaintiff's wrongful trial  at which they faced the death penalty, and the harms he sustained as a direct result.

### COUNT II: 42 U.S.C. § 1983 Violation of Plaintiff's Right Against Self-Incrimination in Violation of the Fifth and Fourteenth Amendments
### Against All Defendant Officers

81.    Plaintiff incorporates by reference all the foregoing paragraphs.

82.    Although Mr. Womack never actually confessed to Francisco Azcona's murder, Defendants Officers coerced Mr. Womack into signing and initialing a made-up statement handwritten by the detectives, which Defendants later misrepresented as a voluntary confession.

83.    The circumstances of Mr. Womack's interrogation were highly coercive, including but not limited to the fact that the defendants isolated Mr. Womack, failed to inform him of his Miranda rights, ignored his requests to have a lawyer present, interrogated him for hours, verbally abused him, and threatened him to coerce a confession from Gregory Womack.

84.    Ultimately, Mr. Womack's coerced statement was used against him at trial, thereby violating Mr. Womack's right against self-incrimination.

85.    As a direct and proximate result of Defendants' actions, Mr. Womack was wrongly convicted and incarcerated for almost 30 years and suffered other injuries and damages as set forth above.

### COUNT III: 42 U.S.C. §1983 Civil Rights Conspiracy
### Against All Individual Defendants

86.     Plaintiff incorporates by reference all the foregoing paragraphs.

87.     The individual defendants, acting within the scope of their employment and under color of state law, agreed among themselves and with other individuals, to act in concert to deprive Plaintiff of his clearly established Fourteenth Amendment rights to be free from deprivation of liberty without due process of law, and to a fair trial.

88.     In furtherance of the conspiracy, the defendants engaged in and facilitated numerous overt acts, including, but not limited to the following:

a.      Deliberately deceiving counsel and the court by concealing and/or withholding relevant and material evidence, fabricating evidence, tampering with evidence, and using coercion and/or threats to obtain inculpatory witness statements; and

b.      Failing to conduct a reasonably thorough and fair investigation that considered evidence negating grounds to believe Plaintiff had committed the crime and ignoring evidence that exculpated Plaintiff.

89.     Defendants' acts and omissions, as described above, were the direct and proximate cause of Plaintiff's injuries.  Defendants knew, or should have known, that their conduct would result in Plaintiff's denial of due process and a fair trial.

**COUNT IV: 42 U.S.C. § 1983 Failure to Intervene**
**Against All Individual Defendants**

90.     Plaintiff incorporates by reference all of the foregoing paragraphs.

91.     By their conduct, under color of state law and acting within the scope of their employment with the City of Philadelphia, the individual defendants had opportunities to intervene on behalf of Plaintiff to prevent the deprivation of liberty without due process of law and to ensure their right to a fair trial, but with deliberate indifference failed to do so.

92.     The defendants' failures to intervene violated Plaintiff's clearly established constitutional right not to be deprived of liberty without due process of law and a fair trial as guaranteed by the Fourteenth Amendment. No reasonable police officer in 1993-1996 would have believed that failing to intervene to prevent these defendants deliberately deceiving counsel and the court, failing to conduct a constitutionally adequate investigation, and causing Plaintiff to be subjected to an unfair trial, were lawful.

93.     Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Plaintiff's injuries. Defendants knew, or should have known, that their conduct would result in Plaintiff's unfair trial.

## COUNT V: 42 U.S.C. § 1983 Municipal Liability Claim
## Against Defendant City of Philadelphia

94.     Plaintiff incorporates by reference all the foregoing paragraphs.

95.     The City of Philadelphia, by and through its final policymakers, had in force and effect during time of Plaintiff's arrest and trial, and for many years preceding and following the trial, a policy, practice, or custom of unconstitutional conduct in homicide and other criminal investigations, that included using coercive techniques in interviews and interrogations; fabricating evidence; fabricating incriminating statements from witnesses, suspects, and arrestees by coercion, threats, and suggestion; tampering with evidence; planting evidence; concealing and/or withholding exculpatory evidence; and failing to conduct a reasonably thorough and fair investigation that considered evidence negating grounds to arrest and prosecute.

96.     Policymakers for the City of Philadelphia had actual or constructive notice of the above practices, policies, and customs, but repeatedly failed to undertake any meaningful investigation into charges that homicide detectives were using coercive techniques in interviews and interrogations: withholding exculpatory evidence; fabricating inculpatory evidence; tampering with evidence; planting evidence; fabricating incriminating statements from witnesses,

23

suspects, and arrestees; failing to conduct a reasonably thorough and fair investigation that considered evidence negating grounds to arrest and prosecute; and failing to take appropriate remedial and/or disciplinary actions to curb the above misconduct.

97.    The unconstitutional municipal customs, practices and/or policies described above were the moving force behind Plaintiff's trial for capital murder, and the other injuries and damages set forth in this Complaint.

### COUNT VI: DAMAGES
### Against All Defendants

98.    Plaintiff incorporates by reference all the foregoing paragraphs.

99.    The unlawful, intentional, willful, deliberately deceptive, reckless, deliberately indifferent, and/or malicious actions and omissions of all defendants caused Plaintiff to be compelled to stand trial facing the death penalty which resulted in pain and suffering, mental anguish, emotional distress, restrictions on personal liberty, loss of freedom, deprivation of familial relationships, economic harms, and other associated damages.

### COUNT VII: PUNITIVE DAMAGES
### Against All Individual Defendants

100.    Plaintiff incorporates by reference all the foregoing paragraphs.

101.    The defendants acted willfully, deliberately, maliciously or with reckless disregard for the Plaintiff's constitutional rights and punitive damages should therefore be awarded against the individual defendants.

WHEREFORE, Plaintiff Gregory Womack requests the following relief:

a.    Compensatory damages to Plaintiff and against all Defendants, jointly and severally, in an amount to be determined at trial;

b.    Punitive damages to Plaintiff and against all individual Defendants, jointly and

severally, in an amount to be determined at trial;

c.  Pre-judgment and post-judgment interest and recovery of Plaintiff costs, including

reasonable attorneys' fees pursuant to 42 U.S.C. §1988 for all 42 U.S.C. §1983

claims;

d.  Any and all other relief to which Plaintiff may be entitled; and

e.  A jury trial as to each defendant and as to each count.

MARRONE LAW FIRM, LLC

By:___s/ Michael D. Pomerantz_____
      Michael D. Pomerantz, Esquire
      PA Atty ID# 83415
      Attorneys for Plaintiff
      200 South Broad Street, Suite 610
      Philadelphia, PA  19102
      (215) 732-6700
      mpomerantz@marronelaw.com

Date: September 27, 2024